[Cite as *State ex rel. Reisinger v. Indus. Comm.*, 2019-Ohio-3344.]

# IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

State ex rel. Cody L. Reisinger,　　　　　:

　　　　Relator,　　　　　　　　　　　:

　　　　　　　　　　　　　　　　　　　　　　　　　　　No. 18AP-621
v.　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　(REGULAR CALENDAR)
Industrial Commission of Ohio et al.,　　:

　　　　Respondents.　　　　　　　　　:

---

## D E C I S I O N

### Rendered on August 20, 2019

---

**On brief:** *Anthony P. Christine*, for relator.

**On brief:** *Dave Yost*, Attorney General, and *Sherry M. Phillips*, for respondent Industrial Commission of Ohio.

**On brief:** *Frost Brown Todd LLC, Noel C. Shepard*, and *Steven M. Tolbert, Jr.*, for respondent Clarkwestern Dietrich Building Systems, LLC.

---

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

SADLER, J.

{¶ 1} Relator, Cody L. Reisinger, filed this original action requesting this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order which denied his request for temporary total disability ("TTD") compensation after finding he had voluntarily abandoned his employment with respondent-employer Clarkwestern Dietrich Building Systems, LLC ("ClarkDietrich") and ordering the commission to find he is entitled to that compensation.

{¶ 2} Relator sustained a work-related injury on February 13, 2017, and his workers' compensation claim has been allowed for the following conditions:   "Strain Muscle, Tendon Back Wall Thorax; and Sprain Ligaments Thoracic Spine." (Aug. 16, 2018 Compl. at ¶ 3.)   He was able to return to restricted duty work the following day and continued to work full-time in a light-duty capacity until January 15, 2018, when he was terminated from employment for having violated his company's safety rules.  Relator filed a C-84 motion requesting the payment of TTD compensation.  The commission denied the application on finding relator voluntarily abandoned his employment, precluding the receipt of TTD benefits, when he committed a violation of a written work rule that resulted in discharge.  *State ex rel. Louisiana-Pacific Corp. v. Indus. Comm.,* 72 Ohio St.3d 401 (1995).

{¶ 3} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, we referred this matter to a magistrate who rendered a decision and recommendation that includes findings of fact and conclusions of law, which is appended hereto.  Therein, the magistrate concluded the commission did not abuse its discretion in denying relator's TTD application.

{¶ 4} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief.  *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967).  A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record.  *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986).

{¶ 5} Relator has not separately set out objections to the magistrate's decision.  However, we are able to discern three objections from relator's "Law and Argument." (Relator's Objs. to Mag.'s Decision at 2.)  First, relator claims the magistrate mistakenly found that relator agreed that he was not wearing his safety glasses on the shop floor.  Second, relator challenges the magistrate's legal conclusion that the decision of the Supreme Court of Ohio in *State ex rel. McKnabb v. Indus. Comm.*, 92 Ohio St.3d 559 (2001), is distinguishable from this case on the facts.  Lastly, relator argues that the magistrate erred and violated the rule of law in *Louisiana-Pacific Corp.* by deeming

relator's termination voluntary where ClarkDietrich's written work safety policy precipitating termination did not clearly and unequivocally define either the prohibited conduct or the grounds for discharge.

{¶ 6}   With regard to relator's first objection, we disagree with relator's contention the magistrate found that relator agreed he was not wearing his safety glasses on the shop floor.  In setting out relator's argument, the magistrate stated: "Relator asserts that his failure to wear the side shields on his safety glasses on January 11, 2018 was not the first time he had failed to wear eye protection and also asserts that side shields are not specifically mentioned in the handbook."  (Mag.'s Decision at ¶ 42.)  The magistrate clearly appreciated the fact that relator was wearing safety glasses on the day in question but had not attached the side shields.  Accordingly, relator's first objection is overruled.

{¶ 7}   Turning to relator's second objection, in *McKnabb*, claimant was fired pursuant to a "strict" employer policy against tardiness.  The commission denied claimant's application for TTD benefits, but this court issued a writ of mandamus ordering the commission to vacate its order denying compensation.  In *McKnabb*, it was undisputed that claimant had been late 15 to 20 times without repercussions before he was discharged for tardiness.  Because the record showed that claimant's tardiness became an issue only after he had filed a workers' compensation claim and requested TTD benefits, the Supreme Court questioned whether relator voluntarily left his employment.  *Id.* at 561-62.  In affirming this court, the Supreme Court noted the " 'great potential for abuse in allowing a simple allegation of misconduct to preclude temporary total disability compensation.' "  *Id.* at 561, quoting *State ex rel. Smith v. Superior's Brand Meats, Inc.*, 76 Ohio St.3d 408, 411 (1996).

{¶ 8}   The magistrate distinguished *McKnabb* as follows:  "The magistrate finds that the present case is distinguishable from *McKnabb.*  ClarkDietrich had a progressive discipline policy which is evidenced here.  Relator received coaching, a written warning, and a suspension before he was terminated.  This situation is very different from the situation presented in *McKnabb.*"  (Mag.'s Decision at ¶ 46.)  We agree with the magistrate.

{¶ 9}   Unlike the largely unenforced work rule at issue in *McKnabb,* ClarkDietrich's written work rules do more than just define prohibited conduct, they set forth a standard of enforcement which ClarkDietrich has followed.  Thus, this case presents a significantly

different set of operative facts than those addressed in *McKnabb,* and a different result is required.  Relator's second objection is overruled.

{¶ 10} Relator's final objection concerns the application of the rule of law in *Louisiana-Pacific Corp.* Relator contends that under *Louisiana-Pacific Corp.*, ClarkDietrich's written rules were ambiguous because they did not clearly and unequivocally state that he would be discharged for failing to wear safety glasses, including side shields, when in the plant.  Accordingly, relator contends his discharge cannot be considered voluntary abandonment of employment.   The magistrate stated that "[p]ursuant to *Louisiana-Pacific* [*Corp.*], the rule must be written in such a way that the worker knew or should have known as a dischargeable offense" and that "ClarkDietrich has met its burden of proving that relator's termination was due to his violation of the company's written work rules, and that it was not an attempt to avoid paying TTD compensation to relator in the future."  (Mag.'s Decision at ¶ 47, 48.)  We agree with the magistrate.

{¶ 11} ClarkDietrich's employee handbook states: **"A second violation of any cardinal rule in any 12-month period may result in termination of your employment."**  (Emphasis sic.)  (Stipulation of Evidence at 96.)  Cardinal Rule No. 4 states: "<u>Always</u> wear <u>all</u> required Personal Protective Equipment (PPE) for your job when in the plant."  (Emphasis sic.)  (Stipulation of Evidence at 101.)  Relator received a three-day suspension for violating Cardinal Rule No. 4 on November 16, 2017 (no safety glasses).  In connection with the suspension, relator received a written warning stating:

> ANY FURTHER VIOLATIONS OF ClarkDietrich POLICIES OR PROCEDURES MAY RESULT IN FURTHER DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION.

(Emphasis sic.)  (Stipulation of Evidence at 106.)

{¶ 12} On January 11, 2018, less than two months after his last cardinal rule violation, relator violated Cardinal Rule No. #4 by failing to wear safety glasses, including side shields, when in the plant.  Relator does not contend that safety glasses, including side shields, are not required PPE when in the plant.  On this record, if relator did not know that ClarkDietrich's cardinal rules required him to always wear all safety equipment when in the plant, including safety glasses with side shields, and did not know that he faced termination

for his next cardinal rule violation, it was not because ClarkDietrich's written rules were unclear or ambiguous. Accordingly, under *Louisiana-Pacific Corp.*, relator's discharge constituted a voluntary abandonment of employment. Because we agree with the magistrate's application of the rule of law in *Louisiana-Pacific Corp.* to the particular facts of this case, we overrule relator's third and final objection.

{¶ 13} Following an independent review of the magistrate's decision and the objections filed by relator, we find the magistrate has determined the pertinent facts and properly applied the relevant law. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. For the reasons set forth in the magistrate's decision and those expressed herein, relator's objections are overruled.

*Objections overruled*;
*writ of mandamus denied.*

KLATT, P.J., and DORRIAN, J., concur.

_____

**APPENDIX**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Cody L. Reisinger, | : | |
| Relator, | : | |
| v. | : | No. 18AP-621 |
| Industrial Commission of Ohio et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

M A G I S T R A T E ' S   D E C I S I O N

Rendered on April 25, 2019

*Anthony P. Christine,* for relator.

*Dave Yost,* Attorney General, and *Sherry M. Phillips,* for respondent Industrial Commission of Ohio.

*Frost Brown Todd LLC, Noel C. Shepard,* and *Steven M. Tolbert, Jr.,* for respondent Clarkwestern Dietrich Building Systems, LLC.

IN MANDAMUS

{¶ 14} Relator, Cody L. Reisinger, has filed this original action requesting this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order which denied his request for temporary total disability ("TTD") compensation after finding that he had voluntarily abandoned his employment with respondent-employer Clarkwestern Dietrich Building Systems, LLC ("ClarkDietrich"), and ordering the commission to find that he is entitled to that compensation.

Findings of Fact:

{¶ 15} 1.  Relator sustained a work-related injury on February 13, 2017 and his workers' compensation claim has been allowed for the following conditions:  "Strain muscle, tendon back wall thorax; sprain ligaments thoracic spine."

{¶ 16} 2.  Relator was able to return to restricted duty work the following day.

{¶ 17} 3.  Relator continued to work full time in a light-duty capacity until January 15, 2018 when he was terminated from employment for having violated his company's safety rules.

{¶ 18} 4.  ClarkDietrich distributed an employee handbook to all of its employees, including relator.  Pursuant to the cardinal rules policy, five cardinal rules are identified and provide, in pertinent part:

> Cardinal Rules are in place to protect your health and welfare and potentially your life. Compliance is in your own best interest as well as that of your family. Cardinal Rules provide guidelines to enforce the most important safety rules. Because of the severe nature of Cardinal Rules, discipline is enforced in an accelerated manner.
>
> **Violation of any Cardinal Rule may result in immediate suspension and final notice.**
>
> **A second violation of any cardinal rule in any 12-month period may result in termination of your employment.**
>
> Cardinal Rules are as follows:
>
> [One] **Always** perform complete lockout/tag-out procedure prior to performing any work or adjustments to any equipment or machinery.
>
> * * *
>
> [Four] **Always** wear **all** required Personal Protective Equipment (PPE) for your job when in the Plant.

(Emphasis sic.)

{¶ 19} 5.  ClarkDietrich provided the following evidence of relator's violations of the cardinal safety rules:

(A) On April 3, 2017, relator was cited for a violation of a safety rule.  The details of the incident include:

> On 4/3/2017 the supervisor was going to the desk on line 153. As he walked up to the desk Cody was at the desk on line 20 using his cell phone. Cody was given a coaching on 11/9/2015 for the using his cell phone on the floor, and he also signed a copy of the employee hand book section on cell phone use saying he understood the policy.

In terms of the plan for improvement, the incident sheet provides:

> Cody will be given a coaching again for using his phone on the floor when it is not break or lunch. Cody got a coaching again because it's been a year and 4 months from his last coaching. The supervisor will remind Cody again that cell phone use on the floor is not aloud and phone should only be used at breaks and lunch.

The notice also provided that:

> ANY FURTHER VIOLATIONS OF ClarkDietrich POLICIES OR PROCEDURES MAY RESULT IN FURTHER DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION.

(Emphasis sic.)

(B) On April 26, 2017, relator was cited for another violation of a safety rule.  The incident was described as follows:

> On 4/25/2017 Cody was given the job assignment to paint on line 9. The Supervisor observed Cody sitting on the lift table painting. When the Supervisor asked Cody if the line was locked out, Cody replied no. The Supervisor immediately directed Cody to retrieve lock out tag out locks and follow the lock out tag out procedure. At this time the Supervisor made sure Cody was aware that while working on the line, non-production activity, the lines should be locked out. On 4/26/2017 Cody was assigned to paint on line 9 again. The Supervisor asked Cody if he had followed the lock out tag out procedure and if the line was locked out, Cody again replied no. Again, the Supervisor immediately directed Cody to retrieve lock out tag out locks and follow the lock out tag out procedure.

In terms of the plan for improvement, the incident sheet provides:

> Cody will be given a Written Warning for not following one of the 5 Cardinal Rules. Cody will also be given a copy of the 5 Cardinal Rules to read and then sign ensuring his full understanding of the Cardinal Rules.

Relator was also notified that:

> ANY FURTHER VIOLATIONS OF ClarkDietrich POLICIES OR PROCEDURES MAY RESULT IN FURTHER DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION.

(Emphasis sic.)

(C) On November 14, 2017, relator received a three-day suspension for the violation of a safety rule.  The incident was described as follows:

> On 11/14/2017 at 3:40 PM Cody was observed in the plant operating a fork lift (open cab) in the production area without proper PPE. He was not wearing safety glasses. When Cody was contacted, and instructed to put on his safety glasses he replied that he had left them in his vehicle. Cody was then instructed to stop what he was doing and retrieve safety glasses before continuing his job assignment. This is a violation of a Cardinal Rule and Cody has been coached through the review process on 10/23/2017 where the Cardinal Rules were reviewed. Cody has been issued a Corrective Action previously on 4/26/2017 for a Cardinal Rule violation (LOTO). The Cardinal Rules have been reviewed in the start of shift KPI meeting and are posted at both time clocks, the break room, and the supervisor office.

The following plan for improvement was noted:

> Cody needs to abide by all safety rules and policies. If there are questions regarding safe work practices and/or policies this should be brought up for resolution.

Again, relator was notified that:

> ANY FURTHER VIOLATIONS OF ClarkDietrich POLICIES OR PROCEDURES MAY RESULT IN FURTHER DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION.

(Emphasis sic.)  Relator signed an acknowledgement of this warning.

(D) On January 11, 2018, relator violated another safety rule and was terminated.  The description of the incident provides:

> On 1/11/18 at 3:35pm Cody Reisinger was observed walking north through the production area near Line 184, without proper Personal Protective Equipment PPE, (no side shields on his prescription safety glasses). Cody was immediately directed to put on his side shields. He removed them from his pocket and placed them on his glasses.
>
> Cody received a Corrective Action on 11/16/2017 for a Violation of Safety Rules, (no safety glasses). The result of the Corrective Action was a 3-day suspension. The suspension was served from 11/28/2017 through 11/30/2017. The Cardinal Rules along with PPE requirements were covered and signed off on 9/15/17. Cody has been coached through the review process on 10/23/2017 where the Cardinal Rules were reviewed. Cody has been issued a Corrective Action previously on 4/26/2017 for a Cardinal Rule violation, Lock Out Tag Out (LOTO). The Cardinal Rules have been reviewed in the start of shift KPI meeting and are posted at both time clocks, the break room, and the supervisor office.

Relator refused to sign the acknowledgment of this violation.

{¶ 20} 6. Thereafter, relator met with Courtney Baker in Human Resources and was terminated.  That documentation provides:

> On 1/15/18, Chris Plant (Plant Superintendent) and myself (HR Business Partner) sat down with Mr. Cody Reisinger following the KPI-start of shift meeting at approximately 3:30 pm with the purpose of termination.
>
> I explained to Mr. Reisinger that he was observed in the plant without proper personal protective equipment, specifically that he did not have side shields on his glasses which was a violation of one of our cardinal rules.
>
> I followed this reading by down the dates of training and methods he was informed of those cardinal rules, to which Mr. Reisinger nodded in agreement. I continued by listing Mr. Reisinger's previous safety corrective actions. I explained to him that he was being terminated as a result of failing to correct his behavior in regards to our safety policies, which we take very seriously at all times.

I offered Cody the piece of paper his termination was documented on. Cody took the paper while I placed a pen nearby so that he may sign. I asked him to sign the paperwork acknowledging the discussion and asked if he had any questions. He did not directly respond, laid the paper back on my desk, and turned to exit. Chris Plant escorted him out of the plant without incident.

{¶ 21} The following was also noted by the Plant Superintendent, Chris Plant:

On the afternoon of 1/15/18 after the start of shift meeting, I escorted Cody Reisinger up to the Human Resources office to discuss an incident that happened with Cody not wearing the required PPE in the plant. Cody came up to the Human Resources office with me in the golf car. Courtney and I met with Cody and discussed the incident and his lack of PPE. We discussed with Cody that this was the third time that he had broken a company Cardinal safety rule. Courtney reviewed the prior incidents with Cody and then reviewed the current incident. Cody agreed that he was not wearing his safety glasses on the shop floor. Cody reviewed the paperwork that Courtney handed him. Cody said "Ok" during the meeting after Courtney was done explaining everything.

I escorted Cody out to the front of the building to his vehicle and shook his hand. Cody said "Thank you" and left the property. Cody didn't ask me any questions during the ride out to his vehicle.

{¶ 22} 7. On January 18, 2018, relator filed a C-84 motion requesting the payment of TTD compensation.

{¶ 23} 8. Relator's motion was heard before a district hearing officer ("DHO") on March 9, 2018. The DHO relied on *State ex rel. Reitter Stucco, Inc. v. Indus. Comm.*, 117 Ohio St.3d 71, 2008-Ohio-499, to award relator TTD compensation from January 16 through March 9, 2018 and continuing.

{¶ 24} 9. ClarkDietrich appealed and the matter was heard before a staff hearing officer ("SHO") on April 20, 2018. The SHO also applied the holding from *Reitter Stucco* and affirmed the DHO's order granting relator TTD compensation beginning January 16, 2018 and continuing.

{¶ 25} 10. ClarkDietrich's appeal was heard before a deputy on June 12, 2018. The deputy vacated the prior SHO order and denied relator's request for TTD compensation.

The deputy determined that, although relator was unable to return to his former position of employment, he was working full time in a modified duty position. The deputy concluded that ClarkDietrich met the requirements of *State ex rel. Louisiana-Pacific Corp. v. Indus. Comm.*, 72 Ohio St.3d 401 (1995), and that relator's violations of the safety rules constituted a voluntary abandonment of employment as follows:

> Documentation on file shows this Employer provided an Employee Handbook to all employees, and conducted safety meetings. In addition, the Employer had an established "Cardinal Rules Policy," which detailed five of the most important safety rules. The form listing these rules indicated the violation of any Cardinal Rule may result in immediate suspension and "final notice," and a second violation in any 12-month period may result in termination of employment. "Corrective Action Notices" on file for this Injured Worker show a 04/03/2017 violation of company policy for using his cell phone on the floor. This was not a "Cardinal Rule" violation. On 04/25/2017 and 04/26/2017, the Injured Worker was cited for violation of lock-out/tag-out procedure. These violations resulted in a written warning for not following one of the five Cardinal Rules, a copy of the Cardinal Rules was given to the Injured Worker, and it was noted further violations may result in further disciplinary action, up to and including termination. The next "Corrective Action Notice" was given as a result of an occurrence on 11/14/2017, when the Injured Worker was observed operating a fork lift in the plant without proper personal protective equipment (safety glasses). This was also a Cardinal Rule violation, resulting in a three-day suspension. The Corrective Action Notice, in a box on the form not used on the prior notice, again repeated the warning "Any further violations of ClarkDietrich policies or procedures may result in further disciplinary action up to and including termination." The final incident occurred on 01/11/2018, when the Injured Worker was observed walking through the production area without proper personal protective equipment, i.e., no side shields on his prescription safety glasses. The Injured Worker was immediately directed to put on his side shields, and he removed them from his pocket and placed them on his glasses. The 01/11/2018 Corrective Action Notice Further specified:
>
> Cody received a Corrective Action on 11/16/2017 for a Violation of Safety Rules, (no safety glasses). The result of the Corrective Action was a 3-day suspension. The suspension was served from 11/28/2017 through 11/30/2017. The

Cardinal Rules along with PPE requirements were covered and signed off on 09/15/2017. Cody has been coached through the review process on 10/23/2017 where the Cardinal Rules were reviewed. Cody has been issued a Corrective Action previously on 04/26/2017 for a Cardinal Rule violation, Lock Out Tag Out (LOTO). The Cardinal Rules have been reviewed in the start of shift KPI meeting and are posted at both time clocks, the break room, and the supervisor office.

Under *State ex rel. Louisiana-Pacific v. Indus. Comm.,* 72 Ohio St.3d 401, 650 N.E.2d 469 (1995), this termination is found to have been a voluntary abandonment of employment, precluding the receipt of temporary total disability benefits, in that the Injured Worker was terminated because he committed a violation of written work rule or policy that (1) clearly defined the prohibited conduct, (2) had been previously identified by the Employer as a dischargeable offense, and (3) was known or should have been known to the Injured Worker. Defenses raised by the Injured Worker that he thought he did not need the side shields on his safety glasses until he got closer to the area of his machine, and that he had not been put on sufficient notice that further violation would result in termination, are rejected.

On the facts present, this case falls under the holding in *State ex rel. Jacobs v. Indus. Comm.,* 139 Ohio St.3d 86, 2014-Ohio-1560, 9 N.E.3d 999. One of the holdings in *Jacobs* was that an injured worker can voluntarily abandon employment so as to preclude payment of temporary total disability compensation, even if the injured worker remains unable to return to his or her former position of employment. In the instant claim, the Injured Worker had no lost time and had gone back to work with restrictions for approximately eleven months. His termination, and loss of earnings effective 01/16/2018, are not causally related to the conditions allowed in this claim.

{¶ 26} 11. Thereafter, relator filed the instant mandamus action in this court.

Conclusions of Law:

{¶ 27} For the reasons that follow, it is this magistrate's decision that this court should deny relator's request for a writ of mandamus.

{¶ 28} The Supreme Court of Ohio has set forth three requirements which must be met in establishing a right to a writ of mandamus: (1) that relator has a clear legal right to the relief prayed for; (2) that respondent is under a clear legal duty to perform the act

requested; and (3) that relator has no plain and adequate remedy in the ordinary course of the law. *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28 (1983).

{¶ 29} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 30} This case must be considered within the historical context in which the voluntary abandonment doctrine has developed. In *State ex rel. Jones & Laughlin Steel Corp. v. Indus. Comm.*, 29 Ohio App.3d 145 (10th Dist.1985), Ernesto Rosado sustained a work-related injury. At some point in time, Rosado voluntarily retired from his job with Jones & Laughlin. Based on Rosado's voluntary retirement, Jones & Laughlin argued in this court that Rosado should not be entitled to an award of TTD compensation. Because Jones & Laughlin had failed to raise the issue before the commission, this court denied Jones & Laughlin's request for a writ of mandamus ordering the commission to vacate its award of TTD compensation; however, this court did address the issue of whether or not an employee's voluntary retirement from the workforce for reasons unrelated to an industrial injury precludes the payment of TTD compensation.

{¶ 31} After citing the syllabus rule of *State ex rel. Ramirez v. Indus. Comm.*, 69 Ohio St.2d 630 (1982), this court stated:

> [T]he industrial injury must not only be such as to render the claimant unable to perform the functions of his former position of employment, but it also must prevent him from returning to that position.

*Jones & Laughlin* at 147. Thereafter, this court set forth the issue before it:

Accordingly, the issue before us is whether a person who has voluntarily taken himself out of the work force and abandoned any future employment by voluntarily retiring is prevented from returning to his former position of employment by an industrial injury which renders him unable to perform the duties of such former position. This raises an issue of causal relationship.

*Id.* Ultimately, this court concluded as follows:

[O]ne who has voluntarily retired and has no intention of ever returning to his former position of employment is not prevented from returning to that former position by an industrial injury which renders him unable to perform the duties of such former position of employment. A worker is prevented by an industrial injury from returning to his former position of employment where, but for the industrial injury, he would return to such former position of employment. However, where the employee has taken action that would preclude his returning to his former position of employment, even if he were able to do so, he is not entitled to continued temporary total disability benefits since it is his own action, rather than the industrial injury, which prevents his returning to such former position of employment. Such action would include such situations as the acceptance of another position, as well as voluntary retirement.

*Id.*

{¶ 32} It was not until *State ex rel. Ashcraft v. Indus. Comm.*, 34 Ohio St.3d 42 (1987), that the foundation for the voluntary abandonment doctrine as we know it today began to take shape. In that case, Nelson C. Ashcraft was injured while working in the scope of his employment as a welder and received TTD compensation for a period of time. After his TTD compensation ceased, Ashcraft was incarcerated in West Virginia on a felony charge, subsequently convicted and imprisoned for first degree murder. Thereafter, Ashcraft sought TTD compensation from the commission.

{¶ 33} The commission ordered Ashcraft's motion suspended until he was released from incarceration. As such, Ashcraft was precluded from receiving any TTD compensation while incarcerated.

{¶ 34} Ashcraft filed a mandamus action in this court seeking an order compelling the commission to hear the application for TTD compensation. This court granted the writ and the matter was appealed to the Supreme Court.

{¶ 35} After considering the purpose of TTD compensation and considering the holding from *Jones & Laughlin,* the *Ashcraft* court, at 44, reiterated that the crux of the decision in *Jones & Laughlin* was:

> The crux of this decision was the court's recognition of the two-part test to determine whether an injury qualified for temporary total disability compensation. The first part of this test focuses upon the disabling aspects of the injury, whereas the latter part determines if there are any factors, other than the injury, which would prevent the claimant from returning to his former position. The secondary consideration is a reflection of the underlying purpose of temporary total compensation: to compensate an injured employee for the loss of earnings which he incurs while the injury heals.

{¶ 36} The *Ashcraft* court concluded that when a claimant has voluntarily removed himself or herself from the workforce, he or she no longer suffers a loss of earnings because he or she is no longer in a position to return to work. The court concluded that this logic would apply whether the claimant's abandonment of his position was temporary or permanent. Ultimately, the court concluded that Ashcraft's incarceration constituted a factor which, independently of his previously recognized work-related injury, precluded his receipt of TTD compensation.  In so finding, the *Ashcraft* court stated, at 44:

> While a prisoner's incarceration would not normally be considered a "voluntary" act, one may be presumed to tacitly accept the consequences of his voluntary acts. When a person chooses to violate the law, he, by his own action, subjects himself to the punishment which the state has prescribed for that act.

{¶ 37} In *State ex rel. Rockwell Internatl. v. Indus. Comm.*, 40 Ohio St.3d 44 (1988), the court again considered whether or not retirement should preclude the payment of TTD compensation. In that case, Rollin Sharp sustained a low back injury in the course of his employment with Rockwell International.  TTD compensation was paid until such time as Sharp was released to return to light-duty work. Ultimately, Sharp retired from his employment but, thereafter, filed an application to reactivate his claim and requested TTD

compensation. Rockwell International argued that TTD compensation should not be paid to Sharp because he had voluntarily retired from his employment.

{¶ 38} Ultimately, the Supreme Court found that TTD compensation was payable based on the commission's finding that Sharp's retirement was causally related to his industrial injury and, thus, was not voluntary. Specifically, the *Rockwell* court stated, at 46:

> Neither *Ashcraft* nor *Jones & Laughlin* states that *any* abandonment of employment precludes payment of temporary total disability compensation; they provide that only voluntary abandonment precludes it. While a distinction between voluntary and involuntary abandonment was contemplated, the terms until today have remained undefined. We find that a proper analysis must look beyond the mere volitional nature of a claimant's departure. The analysis must also consider the reason underlying the claimant's decision to retire. We hold that where a claimant's retirement is causally related to his injury, the retirement is not "voluntary" so as to preclude eligibility for temporary total disability compensation.

(Emphasis sic.)

{¶ 39} In 1995, the Supreme Court decided the seminal case of *State ex rel. Louisiana-Pacific Corp. v. Indus. Comm.,* 72 Ohio St.3d 401 (1995). In that case, Patrick Longmore sustained an injury while in the course of his employment with Louisiana-Pacific Corporation, a self-insured employer under Ohio's workers' compensation laws, who began paying TTD compensation. Longmore was released to return to work on December 17, 1990; however, he did not report to work nor did he call in on December 17, 18, or 19, 1990. In a letter dated December 20, 1990, Louisiana-Pacific notified Longmore that his failure to report to work for three consecutive days violated the company's policy and he was terminated.

{¶ 40} The commission awarded Longmore TTD compensation and this court denied Louisiana-Pacific's request for a writ of mandamus.

{¶ 41} On appeal, the Supreme Court granted the writ of mandamus after finding that Longmore's termination did bar his receipt of TTD compensation. Specifically, the *Louisiana-Pacific* court stated, at 403:

> Recognizing the parallels underlying incarceration and firing, we observed in *State ex rel. Watts v. Schottenstein Stores Corp.* (1993), 68 Ohio St.3d 118, 121, 623 N.E.2d 1202, 1204:
>
> "We agree that firing can constitute a voluntary abandonment of the former position of employment. Although not generally consented to, discharge, like incarceration, is often a consequence of behavior that the claimant willingly undertook, and may thus take on a voluntary character. * * *"
>
> Examining the present facts, we find it difficult to characterize as "involuntary" a termination generated by the claimant's violation of a written work rule or policy that (1) clearly defined the prohibited conduct, (2) had been previously identified by the employer as a dischargeable offense, and (3) was known or should have been known to the employee. Defining such an employment separation as voluntary comports with *Ashcraft* and *Watts*—i.e., that an employee must be presumed to intend the consequences of his or her voluntary acts.

{¶ 42} Relator acknowledges that *Louisiana-Pacific* applies to his situation. However, relator contends he did not know that another violation of a safety rule would result in his termination. Relator asserts that his failure to wear the side shields on his safety glasses on January 11, 2018 was not the first time he had failed to wear eye protection and also asserts that side shields are not specifically mentioned in the handbook.

{¶ 43} With regard to his assertion that he had already violated safety rules and had not been terminated, the magistrate specifically notes that ClarkDietrich provides progressive corrective action, specifically, coaching, verbal warning, written warning, suspension, followed by termination. On April 3, 2017, when relator violated the rule against using his cell phone on the floor, the type of corrective action employed was coaching. On April 26, 2017, when relator did not follow the log-out/tag-out procedure, he was given a written warning. On November 14, 2017, when relator was not wearing his safety glasses, he was given a three-day suspension. Finally, two months later, on January 11, 2018, when relator failed to wear the side shields on his safety glasses, relator was terminated. ClarkDietrich's corrective action increased in severity each time relator violated a safety rule and, ultimately, he was terminated. Relator was given several opportunities to conform to the safety policies of ClarkDietrich.

{¶ 44} Relator asserts that, as in *McKnabb*, ClarkDietrich had not enforced its policy in a manner which would have allowed relator to realize that a future violation would result in termination.

{¶ 45} In *McKnabb*, the commission had argued that there are some common-sense infractions that do not need to be reduced to writing in order to foreclose TTD compensation if the violation triggers termination. In that case, the employer stated it had a strict tardiness policy which it was clear had not been enforced. The claimant in that case was late between 15 and 20 times during an unspecified 6-month period. The decision to enforce it at that time with that injured worker was seen as problematic. The court went on to explain:

> Written rules do more than just define prohibited conduct. They set forth a standard of enforcement as well. Verbal rules can be selectively enforced. Written policies help prevent arbitrary sanctions and are particularly important when dealing with employment terminations that may block eligibility for certain benefits.
>
> This case is a good example. The commission speaks of a "strict" employer policy on tardiness and absenteeism. It was apparently not that strict, however, since the claimant, according to the commission, was late "fifteen to twenty" times during an unspecified six-month period. This scenario raises more questions than it answers: how CCA defined "late" and whether it was the same for all employees; whether the claimant was routinely only a minute late or substantially later; and when the six-month period of tardiness occurred, e.g., whether the accusations of tardiness were suddenly resurrected to justify termination, becoming an issue only after claimant filed a workers' compensation claim.
>
> The commission refers to claimant's "knowledge" of CCA's tardiness policy and the "warning" issued to him concerning chronic tardiness. But the timing of the warning is relevant: was it after the first infraction or the seventeenth? If after the first and the employer continued to ignore late arrival, the validity of the policy may have been diminished in claimant's mind, calling into question claimant's actual knowledge of it. Also relevant is the nature of the warning. These are just some of the areas that verbal policies leave ambiguous.
>
> CCA may well have acted properly. Again, however, because of the potential for abuse, a postinjury firing must be carefully

> scrutinized. Written termination criteria aid this inquiry and
> are why Louisiana-Pacific requires them.

*Id.* at 561-62.

{¶ 46} The magistrate finds that the present case is distinguishable from *McKnabb.* ClarkDietrich had a progressive discipline policy which is evidenced here. Relator received coaching, a written warning, and a suspension before he was terminated. This situation is very different from the situation presented in *McKnabb.*

{¶ 47} Lastly, to the extent relator asserts he did not know a further violation would actually lead to his termination, that is not required. Pursuant to *Louisiana-Pacific,* the rule must be written in such a way that the worker knew or should have known as a dischargeable offense. ClarkDietrich utilized progressive discipline ultimately leading to relator's termination.

{¶ 48} The magistrate finds that the commission did not abuse its discretion when it applied *Louisiana-Pacific* to the facts of this case and determined that ClarkDietrich has met its burden of proving that relator's termination was due to his violation of the company's written work rules, and that it was not an attempt to avoid paying TTD compensation to relator in the future. As such, it is this magistrate's decision that there is some evidence in the record to support the commission's decision, relator has not demonstrated the commission abused its discretion, and this court should deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
STEPHANIE BISCA

**NOTICE TO THE PARTIES**

> Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).